JAMES RUTHERFORD, plaintiff in error, *vs.* JAMES NEW-
SOM, defendant in error.

1. A verdict will not be set aside (and a new trial granted) as being con-
trary to evidence, where the case has been fairly submitted to the jury
on its merits, and no rule of law was violated nor manifest injustice
done, although there may appear to have been a preponderance of
evidence against the verdict, especially if the Judge who tried the
cause is satisfied with the finding.
2. Whilst this Court will maintain its right and duty to grant a new trial
in all cases, where the verdict is strongly and decidedly against the
weight of evidence, and manifest injustice has been done, yet, as a
general rule, it will be extremely cautious in interfering with the ver-
dicts of juries, upon the ground that they are contrary to evidence and
the weight of the evidence, when no rule of law has been violated.

*Complaint* Motion for new trial. Decided by Judge
CLARK, Quitman Superior Court, November Term, 1866.

On the fourteenth day of June, 1854, James Rutherford
bought from James Newsom, as agent for E. R. Graddy, a
negro man named Joe, for nine hundred dollars, gave there-
for his promissory note for that sum, payable to E. R. Graddy
or bearer, on the first day of January thereafter, and took
from said Newsom, as such agent, a bill of sale in the usual
form, warranting said Joe sound in body and mind.

Newsom brought suit upon said note, and Rutherford de-
fended on the ground that said slave was at said time unsound
in body, and worthless.

At the trial, plaintiff read in evidence the note, and
closed.

The defendant read in evidence the bill of sale, and then
the answers of plaintiff obtained by discovery at common
law.

In those answers, plaintiff testified that, as trustee for E.
R. Tinsley, then wife of Haywood Graddy, he ratified an
agreement for the sale of said slave, made by Dr. L. New-
som with the defendant, by receiving said note and giving
said bill of sale; that the note still belonged to his sister,
said *cestui que trust ;* that at that date Graddy and his wife
had parted ; Graddy had delivered to plaintiff, as trustee for

his said sister, certain property, including said slave, and she was then sueing Graddy for a divorce.

Defendant then read in evidence the answers of MARY ANN HOWARD to interrogatories.   She testified that she knew the parties, and a slave named Joe, who once belonged to Elizabeth and Haywood Graddy, and that she thought she knew him three or four years while he belonged to them. She could not state positively when the slave went out of their possession, but, to the best of her recollection, it was in 1853 or 1854, and she thought he then went into defend-ant's possession; that the slave was in defendant's possession, she thought, about two years.   She had heard the negro was dead.

As to his health, she said she had frequently heard him complain of being sick, and he complained of a pain in the breast, head and back.   Witness was then living with her brother-in-law, William Graddy, where said negro had a wife; and he would occasionally lay up for a short time while there, saying he was sick, and complaining as afore-said; he would sometimes come to witness and her sister and ask for camphor, something to take for colic.   Witness had never heard Haywood say anything about Joe's health, but had heard Elizabeth Graddy say Joe was frequently sick— this was while Joe was in possession of Haywood and Eliza-beth Graddy.

Upon cross-examination, she stated that she had heard Joe make similar complaints while in defendant's possession; that she was not related to defendant or his wife, and did not know what became of Joe except by hearsay.

MARIA L. GRADDY, in answer to interrogatories for de-fendant, testified that she knew Joe three or four years, while in possession of Elizabeth and Haywood Graddy; that he went out of their possession into that of defendant, she thought, in 1854, and remained in his possession from about the first of that year to about the end of 1855.   Witness said she should think Joe's health was rather bad, for he often complained of severe misery in his back and breast; he had for several years a wife at witness' house, and when

there, he would often lay up for several days at a time, and complained of a misery in the back and breast.   Witness is sister-in-law of Elizabeth R. and Haywood Graddy.

Said negro was often sick while in possession of said Elizabeth and Haywood; witness never heard Haywood Graddy say anything about Joe's health, but heard Elizabeth Graddy say that Joe frequently lay up and complained as above stated ; never heard her say what she thought the disease was ; she only said the negro was sick and complained of pains in the back and breast.   The negro died shortly before Christmas, 1855, in defendant's possession, and about two years after defendant got possession of him.

Cross-examined, she said she had often heard Elizabeth Graddy speak of Joe's health, both at her own and witness' house, and remembers particularly one time she came to witness' house to see Joe while sick, and said he had such attacks frequently;   Joe at that time was sick, and complained of misery in the back and breast.   No one else that witness remembers was present at that conversation except her sister Mary.   Witness knows not of what disease the negro died, nor whether any one attended him in his last illness ; defendant was at witness' house when a runner came for him and said Joe was dying, and defendant left at once for home ; defendant was at that time a practicing physician, though he never attended Joe as a physician before he bought him, so far as witness knew, and if he knew anything as to Joe's health before buying him, witness does not know it.

The defendant then introduced EDEN JACKSON, who testified that he knew Joe when he saw him, while he belonged to Haywood and Elizabeth R. Graddy, perhaps three or four years, but did not become well acquainted with him till 1853. Witness overseed for William Graddy in 1853, and he hired Joe for that year, and Joe was under witness' supervision that year.   Joe was sick frequently, and was attacked suddenly, and when attacked complained of pains in the back and breast, and during that year lost a good deal of time on account of sickness ; that when he was chopping cotton, he got into the grass because Joe was sick, and when pulling

fodder Joe was taken with the same kind of sickness, and gave him no aid therein till the last day of fodder-pulling. Witness also overseed for William Graddy in 1854, and Joe went into defendant's possession latter part of 1853 or former part of 1854. Witness overseed for defendant in 1855, and again had Joe under him and worked with him; in that year Joe had frequent and sudden attacks of sickness, and complained of pains or misery in the back and breast, as he had done in 1853, with this difference, however, that his attacks were more frequent, and that Joe lost a good deal of time from his old complaint in 1853. Joe was not better than half a hand in the farm; a good hand was worth one hundred and fifty dollars per annum, and Joe only half that, because of his sickness. Joe died in December, 1855; on the morning of his death he and witness were killing hogs, and had killed two, when Joe was taken suddenly sick of his old complaint, clapped his hand to his breast, complaining of pain in his breast, and squatted down.

Soon after, witness and Joe took up the hogs and carried them down to a place where they were to scald the hogs, and witness went up to his house to change his pants or put on another pair over those he had on, and a negro woman ran and told witness Joe was dying. Witness went to him immediately, and Joe drew his last breath immediately upon witness' arrival. From what witness saw and heard on that occasion, he says Joe died of his old disease.

He further testified that Wm. Graddy worked six or seven hands in 1853, and cultivated two hundred acres of land; that defendant resided about a mile or a mile and a half from Wm. Graddy, to go round, but perhaps nearer through; that defendant was a physician, and in 1855 worked ten hands, (including witness,) three of them small, ranging from ten years old up, the other seven were older, and defendant had in cultivation between two and three hundred acres of land.

WILLIAM GRADDY was then introduced by the defendant. He testified that he was Haywood Graddy's brother, and knew Joe when in possession of Haywood and his wife Elizabeth R., and that Joe then had a wife at witness' house.

Joe usually came to see his wife about twice a week, and was frequently taken down sick while there, and complained of pains in the back and breast; that he hired Joe in 1853 from his brother Haywood, hired him as a diseased or unsound negro, was to pay for hire ten dollars per month, deducting for all lost time on account of Joe's sickness or from Joe's running away—Joe ran away for one week, and that and his sickness reduced his hire to sixty-five or seventy-five dollars. Witness gave up Joe in September or October of the year. Haywood and his wife had separated; she was about going to Texas, and Joe fell to her in the division. Witness gave up Joe to Haywood (after he had kept him nine or ten months,) to be delivered up to Elizabeth R. Graddy. Defendant was witness' family physician, and as such visited any of his family when sick, but neither defendant nor any other physician was sent for to see Joe when he was sick. Witness does not know that defendant knew Joe was unsound; he called when sent for to see sick persons at witness' house, but they nor their families visited each other.

Before James Newsom started with his sister Elizabeth R. Graddy to Texas, he proposed to sell said Joe to witness; witness told him he had not the money to buy Joe, and if he had he would not buy him, because he considered Joe unsound—that knowing Joe as well as he did, and knowing he was unsound, he would not give three hundred dollars for him and take the risk, and that he did not wish to own any such diseased negro.

Here defendant rested his case.

Plaintiff introduced Dr. JAMES W. MERCER, who swore that in the early part of 1854 Dr. Newsom sent Joe to defendant to see if he would buy Joe, and hearing that he probably would, Dr. Newsom sold him and delivered him to defendant (subject to ratification of plaintiff when he returned from Texas,) at $800.00 cash, or $900.00 credit till 1st January ensuing. Plaintiff returned in June, 1854, and completed the trade by delivering Joe under said bill of sale and taking said note.

Plaintiff left said note with witness for collection, and de-

fendant learned that he had the note, and when it was due (in January, 1855,) the defendant called on witness and said he had promised to pay it punctually, that his cotton was in Eufaula, that cotton was down and he did not wish to sell then, but would pay it by the first of March, 1855. Defendant failed to pay at the appointed time; about the first of May witness called defendant's attention to it, and defendant, after some hesitation, said he had consulted his attorney, and he had advised him it would be better not to pay the note until the suit then pending between Elizabeth R. Graddy and her husband for divorce was ended, for fear of some difficulty about the title. Defendant seemed concerned about the title, but said nothing about Joe's being unsound or diseased.

Plaintiff next examined THOMAS W. SANDERS, who testified that he knew Joe while he belonged to Haywood and Elizabeth R. Graddy, and in 1853 when William Graddy had him, and thought he was a good hand, but knew nothing about his soundness or unsoundness.

CHARLES L. MATTHEWS then testified for plaintiff: that he knew Joe while in defendant's possession slightly; occasionally saw him at work in defendant's farm—witness and defendant farmed on adjoining farms, and witness lived about a quarter or half mile from him; he thought Joe was a good hand; occasionally saw him with defendant's six or seven other hands working near witness' farm, but witness knew nothing about Joe's health. Defendant cultivated about two hundred and fifty acres of land.

The evidence closed here, and the Court charged the jury as follows. After stating the issue between the parties, he said, that they were to inquire, " 1st. Was Joe unsound at the time of the sale?" 2d. To what extent, if unsound, did said unsoundness affect his value? If he was so unsound as to destroy his value, plaintiff should recover nothing; if, though unsound, he was not wholly worthless, plaintiff's demand should be reduced in proportion to the diminution of value by such unsoundness.

2d. In determining whether the negro was sound or not at

Rutherford *vs.* Newsom.

the time of the sale, the jury were to be governed by the evidence only.

3d. If you believe from the evidence that Joe was diseased before he went into defendant's possession, and afterwards, and died of the same disease, you may find that he was diseased at the time of the sale.

4th. Any complaints made by such slave, as to physical disorder, would be evidence on the point. If such complaints were made concerning the same kind of disorders, through a long period before the sale and until the sale, and eventually some months thereafter the negro suddenly died, making the same kind of complaints, that would tend to show long standing disease.

5th. On the other hand, if defendant, being a physician, and having had the negro in his possession long enough to be well acquainted with his condition, did, after the note fell due, repeatedly recognize his liability therein and provide to pay the whole of it, making no complaints of the negro's unsoundness at the time, this is evidence tending to show that the negro was sound.

6th. These are a part at least of the considerations which you are to weigh concerning the question of fact involved. I am not at liberty to give you an opinion; you are the sole judges thereof. Consider candidly all the evidence, and decide, was the slave sound at the sale? If so, find for the plaintiff the amount of the note and its interest. If the negro was unsound at that time, and to such an extent as to be wholly worthless, find for defendant. If he was unsound, but still of some value, find for plaintiff what is due, after deducting what the proof shows should be taken off for such unsoundness."

Counsel for defendant requested the Court, in writing, to charge, that if the negro was diseased at the time of the sale, the jury cannot find more than said negro was proved to be worth in his diseased condition.

The Judge declined so charging, on the ground that the jury were sufficiently instructed on this point in the last sentence of paragraph 1st, and in the last sentence of paragraph

6th of said charge, and he did not refuse it in presence of the jury, but simply declined to give it, and afterwards told counsel why he declined.

The jury found a verdict in favor of the plaintiff for six hundred dollars, with interest.

A new trial was moved for, on the ground that the Court erred in charging paragraph 5th aforesaid, and in refusing to charge as requested as aforesaid, and because the verdict was strongly and decidedly against the weight of evidence, contrary to law and contrary to the law and evidence.

It is stated in the bill of exceptions that a motion for new trial was made and a new trial was refused.

The plaintiff in error assigns for error that the Court erred—

1st. In its charge to the jury as aforesaid.

2d. In declining or refusing to charge as requested as aforesaid.

A. Hood and B. S. Worrill, for plaintiff in error.

J. L. Wimberly and E. H. Beall, for defendant in error.

Warner, C. J.

1. The error assigned in this case is the refusal of the Court below to grant a new trial. In Lang vs. Brown, (29th Ga. Rep., 628,) this Court stated the rule to be, "that a verdict will not be set aside and a new trial granted, as being contrary to evidence, when the case has been fairly submitted on its merits, and no rule of law has been violated, or manifest injustice done : although, there may appear to have been a *preponderance* of evidence against the verdict, especially if the Judge who tried the cause is satisfied with the finding." The questions of fact submitted to the jury in this case was the soundness or unsoundness of a negro slave at the time of the sale, and if unsound, to what extent did that unsoundness impair his value. The verdict of the jury finds that the slave was unsound at the time of sale, and that his value was

impaired in consequence thereof three hundred dollars. We find no error in the charge of the Court in view of the facts of this case, but, on the contrary, think the law and the facts were fairly submitted to the jury by the Court; and although there may have been a preponderance of evidence as to the unsoundness of the slave, the extent of that unsoundness, and how far it diminished his value, was a question of fact exclusively for the consideration of the jury.

2. While this Court will maintain its right and duty to grant a new trial in all cases where the verdict is strongly and decidedly against the weight of evidence, and manifest injustice has been done, yet, as a general rule, it will be extremely cautious in interfering with the verdicts of juries, upon the ground that they are contrary to evidence and the weight of the evidence, when no rule of law has been violated. A reviewing Court cannot as fully understand from the *record* the credit to which witnesses are entitled, the manner of giving in their testimony, their relation to the parties, and the bias under which they testify, as the court and jury who witness the trial of the case in the court below. The administration of the law in the courts should be a *practical* business for the obtainment of justice, according to law. The rights of the parties in this case having been fairly submitted to the jury upon the trial thereof, and no rule of law having been violated, the presiding Judge being satisfied with the verdict, this Court will not disturb it. Let the judgment of the Court below be affirmed.